Filed 4/19/23  P. v. Prescott CA4/1
Opinion following transfer from Supreme Court

OPINION AFTER TRANSFER FROM THE CALIFORNIA SUPREME COURT

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> DESHAUN PRESCOTT, <br><br> Defendant and Appellant. | D076420 <br><br><br> (Super. Ct. No. SCD268531) |

APPEAL from a judgment of the Superior Court of San Diego County, Charles G. Rogers, Judge.  Affirmed and remanded with directions.

Jill Marnie Klein, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Charles C. Ragland and Julie L. Garland, Assistant Attorneys General, Robin Urbanski, Alana R. Butler and Donald W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Deshaun Prescott of the first degree murders (Pen. Code,[1] § 187, subd. (a)) of Derion White (count 1) and Greggory Davis (count 2). As to count 1, it found true special circumstance allegations of lying in wait (§ 190.2, subd. (a)(15)), personal use and discharge of a firearm (§§ 12022.5, subd. (a), 12022.53, subds. (b) & (c)), and gang benefit (§ 186.22, subd. (b)(5)). As to both counts, the jury found true special circumstance allegations that Prescott was convicted of more than one murder offense in this proceeding (§ 190.2, subd. (a)(3)). As to count 2, it found not true allegations of personal use and discharge of a firearm (§§ 12022.53, subds. (b) & (c)), or gang benefit of the crime (§ 186.22, subd. (b)(5)).[2] In bifurcated proceedings, Prescott admitted the truth of prior conviction allegations under the "Three Strikes" law.

The court sentenced Prescott to two terms of life without the possibility of parole plus a consecutive determinate term of 27 years as follows: 20 years for the firearm enhancement plus five years for a prior conviction enhancement (§ 667, subd. (a)(1)), plus one year each for two prison prior enhancements (§ 667.5, subd. (b).)

In his first appeal, Prescott contended: (1) the court prejudicially erred by denying his request to sever the murder charges; (2) insufficient evidence supported his conviction for Davis's murder under an aiding and abetting theory; (3) the court improperly refused his request for a self-defense jury instruction regarding the Davis murder; (4) insufficient evidence supported the true finding he committed the White murder for the benefit of, at the direction of, or in association with a criminal street gang with the specific

---

[1]    Undesignated statutory references are to the Penal Code.

[2]    The jury found Prescott not guilty of attempted murder of A.E. (count 3) and assault of another individual with a semi-automatic firearm (count 4).

intent to promote, further or assist in criminal conduct by the gang; and (5) under Senate Bill No. 136, the section 667.5 subdivision (b) enhancements must be stricken. The People conceded and we agreed that only the last contention had merit; we therefore affirmed the judgment of conviction and remanded with directions.

Prescott appealed to the California Supreme Court, which transferred the case to this court with directions to vacate our prior decision and reconsider the matter in light of *People v. Renteria* (2022) 13 Cal.5th 951 (*Renteria*) and Assembly Bill No. 333.

Prescott filed a supplemental brief arguing that under *Renteria, supra*, 13 Cal.5th 951, insufficient evidence supports his gang enhancement and therefore the enhancement must be dismissed with prejudice. He alternatively argues that due to Assembly Bill No. 333's amendments to section 186.22, his gang enhancement must be reversed and the matter remanded to the trial court for a retrial on the gang enhancement. We conclude that substantial evidence supported the gang allegation under the law at the time of the jury trial, as clarified by *Renteria*. However, we agree with the People that as this case is not final, Assembly Bill No. 333 applies, and we should remand the case to the superior court. Accordingly, having complied with the California Supreme Court's directions and reconsidered the matter, we vacate our prior opinion and address all of Prescott's contentions, including those in his supplemental brief. We remand for the People to decide whether to retry Prescott on the gang allegation. We also direct the court on remand to strike the section 667.5 enhancements. In all other respects, we affirm the judgment.

3

# FACTUAL AND PROCEDURAL BACKGROUND

## I. *Prosecution Case*

### A. *The Derion White Murder* (*Count 1*)

Close to midnight on June 28, 2016, Prescott, a documented member of the West Coast Crips (WCC) criminal street gang, waited over 30 minutes while White, a documented member of the Neighborhood Crips (NC) gang, was inside a tattoo shop in San Diego. White eventually left the tattoo shop and entered a vehicle through a rear door. Prescott immediately opened that door, shouted, "Where are you from," and fatally shot White in the head. The jury saw surveillance video of Prescott wearing a dark, hooded sweatshirt leaning against a telecommunication box outside the tattoo shop. The video also captured some of Prescott's movements outside the tattoo shop.

The police took DNA samples from a bullet found at the scene, the telecommunication box, and the door handle of the vehicle that White had entered. Police also lifted latent fingerprint images from that vehicle.

A deputy medical examiner testified White died from a bullet fired from an intermediate range that perforated his head and neck.

### B. *Greggory Davis Murder* (*Count 2*)

On the evening of August 2, 2016, Davis, who was not associated with a gang, was with some friends near his residence located in a Blood gang territory in San Diego. D.P. testified she was outside on Alderley Street when she saw Davis approaching her. As she was preparing to greet him, two men wearing dark, hooded sweatshirts approached from the opposite direction. D.P. heard several gunshots and saw one of the men raise his hands and start shooting "everywhere."[3] D.P. panicked and ran into a

---

[3] Specifically, D.P. testified in this exchange:

nearby vehicle with three men in it. Shortly afterwards, Davis entered the car and slumped over. Davis was bleeding from a gunshot wound. D.P. later saw the two men get in a car. D.P. did not see Davis or anybody else carrying weapons during the incident.

A.E. testified that he was on Alderley Street with some friends that evening. Everything appeared normal until he heard numerous gunshots and saw two men coming toward him on Alderley Street. A.E. ran but fell after he was shot in the leg. A.E. looked up and saw Davis was bleeding. A.E. did not see anyone else handling a gun or returning fire. A.E. saw the two men running away.

B.H., his son, and the son's neighborhood friend each testified they were in a car on Alderley Street that afternoon when they suddenly heard multiple gunshots. Shortly afterwards, they saw Davis, who had been shot. Davis entered their vehicle and B.H. drove him to the hospital. Nobody in that vehicle had a gun or returned fire.

C.D., who lived on Alderley Street, heard the gunshots, looked outside her window and saw two men, one of whom wore a red jacket. The other man, later identified as Prescott, was carrying a gun in his hand. C.D. called 911 and reported the incident.

---

"[D.P.:] I just remember looking, like—I guess I—I don't know if—like, I don't know how to explain it. Like, I don't really, like, remember if I seen [*sic*] the actual, like, weapon. But I just remember, like, seeing their hand go up when they did start shooting, though.

"[Prosecutor:] Both or one of the men?

"[D.P.:] I would say I seen one of them, but I wouldn't remember. I just seen the person that was closest to me, his hand go up. But after that, the other person started shooting. I'm not sure."

5

During the incident, some unidentified person shot Prescott in the foot. Prescott left a trail of blood along Alderley Street. Surveillance cameras captured some of the actions of Prescott and his companion.

The day after Davis's murder, Prescott checked into a hospital in Encinitas for his foot injury. The hospital records showed that Prescott's sister told the doctor Prescott was injured by a sledgehammer. Prescott stated he did not remember how he was injured because he had been drinking and using Phencyclidine or PCP. However, an X-ray showed Prescott had received a gunshot wound. Police interviewed Prescott at the hospital, and he denied knowing how he had injured his foot. A technician took his DNA samples. Prescott left the hospital against medical advice. The blood from the trail on Alderley Street as well as reference samples taken from the White murder scene matched Prescott's DNA.

A San Diego Police Department detective investigating Davis's murder reviewed surveillance videos showing the two suspects. At trial, he discussed the directions in which they had moved. The detective pointed out that although neither suspect appeared to be holding a gun in the video, the one identified as Prescott was wearing a baggy, hooded sweater, in which he could have concealed a firearm.

Another San Diego Police Department detective investigating Davis's murder testified based on the forensic evidence that Davis's shooter had fired a .45-caliber gun in a southerly direction on Alderley Street. Police recovered both .45-caliber and nine-millimeter shell casings from the crime scene. Police concluded Davis, A.E. and Prescott were shot in the incident. Davis was shot with a .45-caliber weapon; A.E. was shot with a .38-caliber special or a .357-caliber magnum bullet fired from a revolver; several nine-millimeter handgun bullets were fired in Prescott's direction.

6

The Chief Deputy Medical Officer testified Davis's cause of death was multiple gunshot wounds, and the manner of death was homicide.

C. *Gang Expert's Testimony*

A gang expert testified he had extensive experience investigating gang crimes and interviewing gang members, including from the WCC gang. He concluded Prescott was a documented WCC member who had gang monikers and whose body was tattooed with gang-related words and symbols. The expert opined based on a series of hypotheticals that both White and Davis were murdered for the benefit of the WCC criminal street gang. He opined that White's murder was retaliation for an NC member, A.G., murdering J.J., a well-liked and respected WCC member approximately one month earlier. The expert also explained that immediately before shooting a victim, gang members commonly ask, "Where are you from," and that statement amounts to a "gang challenge."

The gang expert testified the WCC gang members "affiliate with the color blue" but sometimes, when they commit crimes, particularly in a rival gang's territory, they wear the opposing gang's color to "camouflage themselves" so as to sneak up on the victims.

At trial, defense counsel objected that the gang expert had given case-specific testimony in violation of *People v. Sanchez* (2016) 63 Cal.4th 665. The court responded by instructing the jury: "We had testimony that [J.J.], who was a West Coast Crip gang member, was killed by [A.G.], who was a Neighborhood Crip gang member. We heard testimony that if such an event occurs, retaliation may be anticipated by West Coast Crip gang members against the Neighborhood Crip gang members, even if the two are normally allies. That testimony is properly before you, and you may consider it and give it the weight that you feel appropriate . . . . [¶] However, there was also

7

an occasion or two where the opinion was expressed that, following the killing of [J.J.], there was a period of tension between the two gangs. I am striking that testimony from the record and ask that you disregard any reference to a period of tension between the time of the killing of [J.J.] on May 29th and the killing of [ ] White on June 29th. [¶] Please disregard any notion or opinion that there was a period of tension."

## II. *Defense Case*

An investigator testified that when he interviewed C.D., she never told him that she clearly saw Prescott holding a gun during the Davis incident; rather, she said Prescott was holding something that she assumed was a gun. Another investigator testified that Prescott was previously housed in the same jail cell as J.J.'s accused killer.

## DISCUSSION

## I. *Severance Motion*

Prescott contends the court violated his constitutional right to due process by denying his motion to sever count 1 (involving victim White) from the remaining counts, therefore precluding him from presenting a self-defense theory and testifying regarding count 2 (the Davis case). He further contends the court refused his request to instruct the jury regarding self-defense in the Davis case.

## A. *Background*

Before trial, Prescott moved to sever count 1 from the other counts, arguing the evidence in the murder cases would not be cross-admissible in hypothetical separate trials. Prescott added that no common modus operandi linked the two murders. He pointed out White was murdered execution-style, while Davis was apparently killed by random gunshot. Prescott claimed that joinder would impermissibly bootstrap the stronger Davis case onto the

8

weaker White case. Prescott further contended: "Obviously if [ ] Prescott wishes not to testify as to one of the charges, yet chooses to testify as to the other, the jury is very likely to imply a finding of guilt on the charge to which [he] remains silent. [¶] Where the defense must use inconsistent defenses against the various charges, there is a substantial danger that the jury will be unable to separate, or unwilling to believe, the different evidence properly admitted as to each defense. . . . This predicament would undoubtedly cause prejudice to [ ] Prescott, further supporting that severance is warranted in this case."

The People countered that joinder was proper because under section 954, "the offenses are of the same class of crimes. Two counts are the exact same, murder, another count is attempted murder, and the last one is assault with a semi-automatic firearm. All counts are assaultive crimes, . . . and all counts carry an allegation that [Prescott] personally used a firearm when committing the offenses." The People also argued the gang evidence was the same for each homicide, and the crimes were further linked because they occurred close in time and were gang-motivated.

At the motion hearing, defense counsel claimed joinder would prejudice Prescott: "Each case has a different type of defense. And the idea that, as most of the case law talks about, if a defendant wants to testify as to one case but not the other, then, obviously, that is also going to be considered by the jury. And . . . they could believe that [Prescott is] guilty of one [crime] just because he didn't testify to it."

In analyzing the cross-admissibility of evidence, the court took into account the common evidence linking the two murder counts, including surveillance videos and fingerprint and DNA test results. It denied Prescott's motion to sever, ruling the cases were properly joined under section 954

9

because they both dealt with the same offense of murder. It also rejected the notion that severance was required because one murder charge was weaker and would be bootstrapped onto the stronger one.

B. *Legal Principles*

" 'The law favors the joinder of counts because such a course of action promotes efficiency.' " (*People v. Scott* (2015) 61 Cal.4th 363, 395.) Section 954, which governs the joinder of criminal counts, states: "An accusatory pleading may charge two or more different offenses connected together in their commission, . . . or two or more different offenses of the same class of crimes or offenses, under separate counts, . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately." (§ 954.)

To prove error, Prescott as the party seeking severance must show a clear potential of prejudice exists, requiring that the charges be separately tried. (*People v. Osband* (1996) 13 Cal.4th 622, 666.) As we review the court's ruling for an abuse of discretion (*ibid.*), Prescott must demonstrate the denial of his motion exceeded the bounds of reason. (*People v. Manriquez* (2005) 37 Cal.4th 547, 574.) " 'Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns into a capital case.' " (*People v. Scott, supra,* 61 Cal.4th at pp. 395-396.)

10

The above criteria should not be misunderstood as being equally significant, however. "[T]he first step in assessing whether a combined trial [would have been] prejudicial is to determine whether evidence on each of the joined charges would have been admissible, under Evidence Code section 1101, in separate trials on the others. If so, any inference of prejudice is dispelled." (*People v. Balderas* (1985) 41 Cal.3d 144, 171-172; see *People v. Mason* (1991) 52 Cal.3d 909, 934.) Cross-admissibility suffices to negate prejudice, but it is not needed for that purpose. (*People v. Osband, supra,* 13 Cal.4th at p. 667.)

C. *Analysis*

We conclude the statutory requirements for joinder were met here because the different charges involved the same class of crimes—murder and attempted murder—and the use of firearms. We next consider whether the court erred by denying the motion to sever. We conclude it did not because certain evidence would be cross-admissible in hypothetical separate trials. Specifically, Prescott murdered the two victims within five weeks of each other, and the investigation of the two murders involved DNA and fingerprint evidence linking Prescott to both crimes. Moreover, the gang expert's testimony was relevant to both counts 1 and 2. The cross-admissibility factor " 'alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges.' " (*People v. Merriman* (2014) 60 Cal.4th 1, 38.)

Even assuming the evidence would not be cross-admissible in separate hypothetical trials, we would conclude based on the factors guiding our prejudice analysis that the court did not err in denying Prescott's severance motion. "If we determine that evidence underlying properly joined charges would *not* be cross-admissible, we proceed to consider 'whether the benefits of

11

joinder were sufficiently substantial to outweigh the possible "spill-over" effect of the "other-crimes" evidence on the jury in its consideration of the evidence of defendant's guilt of each set of offenses.'" (*People v. Soper* (2009) 45 Cal.4th 759, 775.)

Here, as to the first factor, it was not probable that the evidence in either murder case was "particularly likely to inflame the jury" (*People v. Soper, supra,* 45 Cal.4th at p. 776) against Prescott, as both cases involved the same crime, the use of firearms, and gang-related circumstances. Therefore, we consider this factor did not support severance. Second, neither case was particularly stronger than the other. Surveillance videos linked Prescott to both incidents, and the fingerprint or DNA evidence from one crime helped solve the other crimes. In one sense, the execution-style murder in the White case makes it appear stronger. On the other hand, the seemingly random nature of Davis's murder makes that case appear stronger, particularly because Davis was not a gang member. "In any event, as between any two [sets of] charges, it always is possible to point to individual aspects of one case and argue that one is stronger than the other. A mere imbalance in the evidence, however, will not indicate a risk of prejudicial 'spillover effect,' militating against the benefits of joinder and warranting severance of properly joined charges." (*Soper,* at p. 781.) Finally, the joinder of the two sets of charges did not convert the matter into a capital case and none of the charges carried the death penalty. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1244.) Accordingly, we conclude Prescott has not established the trial court's decision to deny his severance motion " ' " ' " 'falls outside the bounds of reason.' " ' " ' " (*Soper,* at p. 774.) He has not met his burden to make a *clear* showing of prejudice that would compel reversal. (*Ibid.*)

Although we conclude the trial court's denial of Prescott's severance motion was proper at the time it was made, "[b]ecause the issue is raised on appeal following trial [and Prescott asserts he was denied a fair trial by the denial of his severance motion], we must also consider whether 'despite the correctness of the trial court's ruling, a gross unfairness has occurred from the joinder such as to deprive the defendant of a fair trial or due process of law.'" (*People v. Sandoval* (1992) 4 Cal.4th 155, 174.)

Prescott argues he was prejudiced because once his severance motion was denied, he could not present a self-defense claim in the Davis case, particularly because the court refused to instruct on that theory. He further contends "the People's case as to the Davis shooting [ ] was not particularly overwhelming. While the video evidence showed [Prescott] walking . . . just prior to the shooting, and then running away [from the scene], there was no evidence he was armed and the jury in fact returned not true findings on the firearm enhancements attached to this count. . . . That the jury acquitted [him] of counts 3 and 4, which arose from the Davis shooting incident, further shows the jury had doubts as to what happened during this incident."

Prescott's claim he was not armed in the Davis incident is not supported by the record. C.D. testified that immediately after she heard the gunshots, she saw Prescott carrying a gun. Further, the jury could reasonably have concluded based on D.P.'s testimony that Prescott was armed. D.P. simultaneously saw him raise his hand and heard gunshot fire. Separately, the fact the jury ultimately found the firearm enhancements in the Davis case not true does not alter our conclusion the court—given the evidence presented to it at the time of the severance motion—properly joined the cases based on the factors set forth above.

As to Prescott's claim he suffered prejudice from the joinder because he was obligated to choose between testifying regarding one charge but not another charge, the California Supreme Court discussed this issue in *People v. Landry* (2016) 2 Cal.5th 52 and stated: "Although federal courts have interpreted their rule to permit severance when a defendant can show prejudice because he or she ' "wishes to testify to one charge but to remain silent on another" ' [citation], they recognize that ' "severance is not mandatory every time a defendant wishes to testify to one charge but to remain silent on another. If that were the law, a court would be divested of all control over the matter of severance and the choice would be entrusted to the defendant." ' [Citation.] Under the two-part test devised by the federal courts, 'severance is required when a defendant demonstrates that he has *both* (1) important testimony to give concerning some counts and (2) a strong need to refrain from testifying with regard to other counts.' [Citation.] To satisfy the second part of the test, the defendant must demonstrate that his or her testimony on the counts about which he or she did not wish to testify was essential to the prosecution's meeting its burden of proof on those charges." (*Landry,* at p. 80.)

Under *Landry,* Prescott's showing in the trial court regarding purported prejudice fell far short of what is needed. As he concedes, he did not explain the importance of the testimony he wished to give in the Davis case. Moreover, Prescott did not show that the testimony he withheld in the White case was essential to the prosecution's case against him. As set forth above, Prescott merely argued generically that he would suffer prejudice because he would not be able to testify at trial regarding the White case. To the extent he intended to rely on a self-defense theory in the Davis case, that

14

claim was unavailing, as we discuss below. Accordingly, on this record, the trial court did not abuse its discretion in denying severance.

## II. *Self-Defense Instruction Regarding Davis's Murder*

Prescott contends the court erroneously declined his request to instruct the jury on self-defense in the Davis case despite substantial evidence supporting that defense. He points out that the ballistics evidence showed three different weapons were fired at the crime scene and, contrary to some trial testimony, someone else fired a gun at him. He argues that "it was unclear who fired first, and the video evidence could be viewed as contradicting the People's theory [that he] and the perpetrator walked up and opened fire."

## A. *Background*

Defense counsel requested the court modify CALCRIM No. 500 to incorporate a self-defense instruction.[4] The court at the outset of the hearing on the request summarized the law regarding instruction on defenses: "I also understand that the Court doesn't judge witness credibility in making that determination. . . . It's also true that speculation is not evidence. And if

---

[4] The court instructed the jury with CALCRIM No. 500: "Homicide is the killing of one human being by another. Murder is a type of homicide. The defendant is charged with Murder." It denied Prescott's request to instruct the jury with a paragraph included in the standard Judicial Council form instruction for use in certain cases: "[A homicide can be lawful or unlawful. If a person kills with a legally valid excuse or justification, the killing is lawful and he or she has not committed a crime. If there is no legally valid excuse or justification, the killing is unlawful and, depending on the circumstances, the person is guilty of either murder or manslaughter. You must decide whether the killing in this case was unlawful and, if so, what specific crime was committed. I will now instruct you in more detail on what is a legally permissible excuse or justification for homicide.] [I will [also] instruct you on the different types of (murder/ [and] manslaughter).]"

15

what we're talking about is speculation as opposed to something that a reasonable juror might find persuasive, then that's not sufficient."

Relying on a trial exhibit showing the neighborhood where the Davis murder occurred, defense counsel argued in proceedings outside the jury's presence: "[T]his is a residential neighborhood. So the streets are not wide. It's not a freeway. It's not multiple lanes going each way. This is a residential neighborhood. And based on what we saw from the video, it wouldn't have taken those 19 seconds for these individuals [Prescott and his accomplice] just to come and just start shooting first. Something happened. We don't know what happened, but something happened."

The prosecutor responded: "The defense has not presented one witness who testified . . . in any way saying, [']yeah, well, we were walking, and this group opened fire on us.['] So I think the basis of their argument is credibility. It's speculating."

In an exchange with the court, defense counsel conceded that any claim regarding the timing of the initial gunshot fire and of the return fire was speculative:

"[Defense counsel:] If the individuals just cross the street and automatically started firing, it wouldn't have taken 19 seconds.

"[The Court:] Well, we don't know that they [Prescott and his accomplice] automatically started firing. They could have crossed the street and stood and looked and then walked and then opened fire.

"[Defense counsel:] They could have. But, again, we're all speculating as to what—it doesn't take—the fact that it's possible for them to have fired first, it doesn't take it away, because Your Honor is speculating, I'm speculating, because we were not there. . . . We still have—we don't know exactly where all the guns were positioned."

16

After reviewing the evidence, the court declined to instruct regarding self-defense: "This is Blood gang territory, and Mr. Prescott is a Crip who's crossed three gang territories to get there. Now, that doesn't mean he didn't act in self-defense when he got there. But the point is it stands to reason that everybody who was outside . . . was [an] associated Blood gang member or affiliate or hanger-on. And it seems to me unlikely that the person down there would be shooting upward in that direction unless shots had previously been fired in their direction. When you add that to the fact that it looks like the shots are going off to the right as we're looking in the diagram, that is, going to the east on Alderley [Street] because it hits the car on the corner that's just sitting in its driveway, and we have the first bloody footprint along there." The court concluded: "I think the only reasonable interpretation was that [Prescott] fired first. I think it's speculation to suggest otherwise. And I don't think speculation warrants the self-defense instructions."

B. *Applicable Law*

"A trial court must instruct the jury on general principles of law necessary for the jury's understanding of the case." (*People v. Ramirez* (2019) 40 Cal.App.5th 305, 307.) As part of that duty, the court has a sua sponte duty to instruct on defenses relied upon by the defendant. (*People v. Breverman* (1998) 19 Cal.4th 142, 157.) "In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.' " (*People v. Salas* (2006) 37 Cal.4th 967, 982.) The trial court does not have a duty to give instructions based solely on conjecture and speculation. (*People v. Young* (2005) 34 Cal.4th 1149, 1200.) To justify an act of self-defense, the defendant must have an honest and reasonable belief that

17

bodily injury is imminent. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064.) The right of self-defense is limited to the use of force that itself is reasonable under the circumstances. (*Ibid.*)

" 'Errors in jury instructions are questions of law, which we review de novo.' " (*People v. Fenderson* (2010) 188 Cal.App.4th 625, 642.)

C. *Analysis*

We conclude the trial court did not err in refusing to instruct the jury on self-defense because substantial evidence did not support that instruction. (See *People v. Blair* (2005) 36 Cal.4th 686, 744-745 [substantial evidence means "evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist"], overruled on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919.) "[B]oth self-defense and defense of others, whether perfect or imperfect, require an actual fear of *imminent* harm." (*People v. Butler* (2009) 46 Cal.4th 847, 868.)

Prescott argues that "the jury could have found [he] went to the neighborhood to visit friends, . . . and encountered rival gang members who fired upon him." He adds: "[T]he evidence strongly suggested someone . . . was armed as [Prescott] and his colleague approached on foot. The jury could have thus rejected the witness testimony that no one outside . . . was armed, which was contradicted by the physical evidence, and instead had reasonable doubt as to whether someone shot first toward [Prescott] with a [nine]-millimeter weapon." We conclude that the cited evidence—which relates only to Prescott's purported proper motive for being in the rival gang's neighborhood, and also might discredit testimony that no one else fired a gun during the incident—did not suffice to support a self-defense instruction. Critically, that evidence fails to show who fired first or, more to the point,

18

that it was another person who first fired at Prescott, necessitating that he return fire. To the contrary, the testimony on this issue by D.P. and A.E. supported the theory that Prescott and his companion opened fire, Prescott was hit with return fire and fled the scene. Absent evidence that someone fired at Prescott first, the court had no basis for instructing regarding self-defense because no evidence was presented to help the jury conclude that Prescott, in turn, " 'was actually in fear of his life or serious bodily injury and that the conduct of the other party was such as to produce that state of mind in a reasonable person.' " (*People v. Wilson* (1976) 62 Cal.App.3d 370, 374.)

III. *Sufficiency of the Evidence to Support the Davis Murder Conviction*

Prescott contends there was insufficient evidence that he aided and abetted Davis's murder. While acknowledging that the evidence showed him and another individual approaching the crime scene together, he argues that "nothing in the record indicates he facilitated the shooting in any manner." Prescott adds: "The jury found [him] guilty of the first degree murder of Davis, but found not true the firearm enhancements. The verdict thus makes clear, to the extent the jury found [him] guilty of murder as charged in count 2, it did so only on an aiding and abetting theory."

The People counter that sufficient evidence supported the aiding and abetting theory and, in any event, Prescott's contention fails because the prosecutor at trial argued both that Prescott directly perpetrated the murder, and aided and abetted the direct perpetrator. The People point out the jurors were not required to unanimously agree on either theory of guilt.

A. *Background*

The court instructed the jury with CALCRIM No. 400: "A person may be guilty of a crime in two ways. One, he may have directly committed the crime. I will call that person the perpetrator. Two, he may have aided and

19

abetted a perpetrator, who directly committed the crime. [¶] A person is guilty of a crime whether he committed it personally or aided and abetted the perpetrator."5

Defense counsel argued to the jury in closing about the People's burden to prove that Prescott aided and abetted Davis's murder: "They're giving you all of these theories of what happened. That's because they cannot put a gun in [ ] Prescott's hand. So what do they do? They throw everything at the wall. It's either he's a shooter or he aided and abetted somebody or he's responsible for the shooting of somebody else. Aiding and abetting is not black and white. They still have to convince you beyond a reasonable doubt that—if they're going to go under the theory of aiding and abetting, that [ ] Prescott knew . . . what the perpetrator was going to do before or during the commission of the crime; [ ] Prescott intended to aid and abet the perpetrator; and that he did something to help that person. They have to convince you beyond a reasonable doubt that [ ] Prescott shared the same intent of what

_____

5     The court also instructed the jury with CALCRIM No. 401: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone *aids and abets* a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. [¶] If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor. [¶] If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him an aider and abettor."

the other person did. Not just that maybe he knew what the other person was going to do, but that he shared the intent to shoot somebody or to kill somebody. That has not been proven beyond a reasonable doubt."

B. *Applicable Law*

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one." (*People v. Smith* (2005) 37 Cal.4th 733, 738.) We " 'review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Story* (2009) 45 Cal.4th 1282, 1296; see *Jackson v. Virginia* (1979) 443 U.S. 307, 319 ["[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"].) " ' "[W]e must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*Smith,* at pp. 738-739.) Moreover, "[w]e resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 403.) It is the jury that weighs the evidence, assesses witness credibility, and resolves conflicts in the testimony. (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.) Therefore, "[a] reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

In *People v. Majors* (1998) 18 Cal.4th 385, 408, the California Supreme Court stated the jurors need not unanimously agree on a theory of guilt: " 'It

is settled that as long as each juror is convinced beyond a reasonable doubt that defendant is guilty of murder as that offense is defined by statute, it need not decide unanimously by which theory he is guilty. [Citations.] More specifically, the jury need not decide unanimously whether defendant was guilty as the aider and abettor or as the direct perpetrator. [Citations.] This rule of state law passes federal constitutional muster.' " (*Ibid.*)

C. *Analysis*

We conclude sufficient evidence supported the jury's finding that Prescott participated in the murder. He elected to go into a rival gang's territory with an accomplice who was wearing red clothing, which the expert testified could be a form of camouflaging to get close to a victim to avoid being detected. D.P. testified she saw one of the men's upraised hand at the same time she heard the gunshot. The jury could have concluded Prescott either fired a shot in Davis's direction or was giving cover to the shooter. Davis was shot six times, indicating an intentional gunning down and not a random hit by a stray bullet. C.D. testified she saw a gun in Prescott's hand. Prescott at a minimum facilitated the crime by aiding the pair's getaway from the crime scene. Surveillance videos captured the two men fleeing the scene. Police found a trail of Prescott's blood on the street and sidewalk. In light of the abundant testimony showing Prescott's participation in Davis's murder, and the court's instruction with CALCRIM No. 400 that the jurors could find Prescott guilty either as a direct participant or as an aider or abettor, we need not analyze this issue further because the jury was not required to unanimously agree on a single theory of guilt. (*People v. Majors, supra,* 18 Cal.4th at p. 408.)

In an analogous case in which the jury found not true a knife use enhancement, the California Supreme Court explained that the jury finding

"shows only that there was a reasonable doubt in the minds of the jurors that defendant specifically used a knife. *It does not show the reverse, that the jury specifically found defendant was an aider and abettor.* Indeed, under the facts of this case, such a finding is most unlikely. The jury may merely have believed, and most likely did believe, that defendant was guilty of murder as either a personal knife user or an aider and abettor but *it may have been uncertain exactly which role defendant played.*" (*People v. Santamaria* (1994) 8 Cal.4th 903, 919.) Likewise, the jury here unanimously convicted Prescott of murder, but it may have been uncertain exactly what role he played in it; that is, whether he personally used a gun or was an aider and abettor.

IV. *Challenge to True Finding that White's Murder was Gang-Related*

In his first appeal, Prescott argued we should reverse the jury's true finding that his murder of White was gang-related under section 186.22, subdivision (b)(1), as it was not supported by sufficient evidence. He specifically argued: "While there was evidence of the earlier [J.J.] murder, the evidence established it was personally motived [*sic*], there was no evidence the killing caused a riff [*sic*] between the sister gangs following this incident, and in fact the gangs remained allies. To the extent [the gang expert] opined that retaliation would be expected, this was [his] generalized belief as to what might occur, without any factual support." Prescott concluded the testimony regarding a dispute between the NC and the WCC gangs "was not supported by actual evidence." Prescott also argued that all of the gang expert's opinions regarding a retaliatory killing based on that "foundationally faulty premise" lacked evidentiary value.

In his supplemental brief, Prescott argues there was no evidence of an actual dispute between his gang and White's gang; he was a lone actor who had a long-time friendship with White; and there was no evidence he "called

out his gang name or made gang signs in relation to the shooting, or took credit for it on behalf of his gang afterward."

A. *Background*

A detective who investigated [J.J.'s] murder testified, "For whatever reason [A.G. and J.J.] had a beef. They had problems with one another, which led to [A.G.] murdering [J.J.]." The prosecutor asked the detective whether he knew "if in fact that relationship between the Crips set was restored." The detective replied, "It's my belief that they're back to being allies again."

The prosecutor asked the gang expert this hypothetical: "Suppose a West Coast Crip gang member is killed by a Neighborhood Crip, and a month later a West Coast Crip gang member shoots and kills a Neighborhood Crip execution style. [¶] Do you have an opinion as to whether or not that crime would be committed for the benefit of a criminal street gang?" The expert replied, "Yes. I believe it would." The expert elaborated: "[W]hen a West Coast Crip member is killed . . . there's an expectation that there will be retaliation and the person—the gang member who commits the homicide gains standing within his gang set because he's known to be somebody who's going to put in work, who's going to commit violent acts on behalf of the gang. [¶] And, also, it's going to gain respect for the gang because it's going to send a message to everybody that you cannot attack or kill our gang members without something happening in return. You should expect retaliation because we're to be feared; we're to be respected."

The prosecutor asked the gang expert whether the "West Coast Crip retaliation killing of a Neighborhood Crip" would "assist further or promote further conduct by gang members." The expert responded, "I believe it—I believe it furthers and assists."

24

B. *Applicable Law*

Section 186.22, subdivision (b) provides enhanced punishment for a felony committed for the benefit of, at the direction of or in association with a criminal street gang with the specific intent to promote, further or assist in criminal conduct by gang members. (§ 186.22, subd. (b).) Under the version of section 186.22 in effect at the time of Prescott's trial, "pattern of criminal gang activity" was defined as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [specified] offenses, provided at least one of these offenses occurred after [January 1, 2008,] and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (Stats. 2017, ch. 561, § 178 [former section 186.22, subdivision (e)].)

This enhancement has two prongs—the gang-related benefit prong and the specific-intent prong—"both of which must be established by the evidence." (*People v. Franklin* (2016) 248 Cal.App.4th 938, 948.) The first prong requires the prosecution to prove that the underlying felony was "gang-related," that is, that the defendant committed the charged offense "for the benefit of, at the direction of, or in association with any criminal street gang." (§ 186.22, subd. (b)(1)); *People v. Albillar* (2010) 51 Cal.4th 47, 60.) The second prong "requires that a defendant commit the gang-related felony 'with the specific intent to promote, further, or assist in any criminal conduct by gang members.'" (*Albillar, supra*, at p. 64; § 186.22, subd. (b)(1).) The defendant does not need to "act with the specific intent to promote, further, or assist a *gang*; the statute requires only the specific intent to promote, further, or assist criminal conduct by *gang members*." (*Albillar*, at p. 67.) Of course, "[r]arely is the perpetrator's intent proven by direct evidence; usually it must

25

be inferred from the facts and circumstances surrounding the case." (*People v. Perez* (2017) 18 Cal.App.5th 598, 601.)

In *Renteria*, the California Supreme Court clarified when section 186.22, subdivision (b)'s gang enhancement applies to a gang member who acts alone: "Not every crime committed by an individual gang member is for the gang's benefit or to promote criminal conduct by gang members . . . . [G]ang members can, of course, commit crimes for their own purposes." (*Renteria, supra*, 13 Cal.5th at p. 957.) When a gang member acts alone, "[t]wo features of the intent requirement are particularly relevant[.]" (*Renteria*, at p. 965.) First, "a defendant facing sentence enhancement allegations for a gang-related felony under section 186.22[, subdivision] (b) must at least be aware of the type of criminal activity the gang members pursue; without such awareness, the defendant cannot intend to aid in such activity." (*Ibid*.) Second, "[b]ecause the showing of intent must include the intent to promote criminal activity by others, in a lone-actor case this necessarily means an intent to promote criminal activity other than the charged offense." (*Id*. at p. 966.)

The California Supreme Court also held that, without more, "expert testimony about the reputational benefits of crime does not support an inference that a lone gang member committed a crime for gang-related reasons—as opposed to acting from other, more personal motives." (*Renteria, supra,* 13 Cal.5th at p. 957.) To support a gang enhancement allegation, expert opinion about the reputational benefits of the defendant's crime must be grounded in the facts of the case, such as through evidence that: (1) the defendant made his gang membership known or later took credit for the crime; (2) the victim was a gang member or rival of the defendant's gang; or

(3) the defendant acted out of retaliation for past gang activity or because of a gang-related dispute. (*Id*. at pp. 967-968.)

We apply the same substantial evidence standard of review discussed above to a challenge to the sufficiency of the evidence to support a gang enhancement. (*Albillar, supra*, 51 Cal.4th at pp. 59-60.)

Although this is a lone-actor case, it is distinguishable from *Renteria*. Here, as to section 186.22's gang-related benefit prong, an expert testified that Prescott, a gang member, shot White in retaliation for the recent murder of a member of Prescott's gang by a member of White's rival gang. The *Renteria* court reaffirmed that " ' "[e]xpert opinion that particular criminal conduct benefited a gang" is not only permissible but can be sufficient to support the . . . gang enhancement.' " (*Renteria, supra,* 13 Cal.5th at p. 967.) The court elaborated: "[A]ppellate courts have relied on similar factors— whether the defendant's gang membership was apparent to observers, whether the victim was a gang member or rival of the defendant's gang, and whether retaliation for prior gang activity or disputes prompted the defendant's crime—to describe the limits of reputation evidence and ensure that it is grounded in specific facts that show the defendant acted on behalf of a gang rather than for personal reasons." (*Id*. at p. 968.)

As to section 186.22's specific intent prong, Prescott asked White where he was from immediately before shooting him. In light of the expert's testimony regarding the impact of that statement or question in the gang context, we conclude those words provide substantial evidence that Prescott "intended his actions to be attributed to his gang." (*Renteria, supra,* 13 Cal.5th at p. 971.) Accordingly, Prescott did not shoot White for his own personal purposes. The gang expert testified that it is "very common" in gang-related murders that those words are used, and they act as a "gang

27

challenge to another member." He added that generally there is "no good answer" to the question because it is typically "followed by a violent act against that person." Sufficient evidence supported the true finding on the gang enhancement.

## V. *Assembly Bill No. 333*

The California Supreme Court has pointed out: "Assembly Bill [No.] 333 made the following changes to the law on gang enhancements: First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.' (§ 186.22, subd. (f), italics added.) Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill [No.] 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang. (§ 186.22, subd. (f), italics added.) Third, Assembly Bill [No.] 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense. (§ 186.22, subd. (e)(1), (2).) Fourth, Assembly Bill [No.] 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.' (§ 186.22, subd. (g).)" (*People v. Tran* (2022) 13 Cal.5th 1169, 1206 (*Tran*).)

The amendments to section 186.22 under Assembly Bill No. 333 apply retroactively to defendants whose judgments are not yet final on the amendment's operative date. (*Tran*, *supra,* 13 Cal.5th at p. 1207.) Accordingly, Prescott is entitled to the benefit of the amended section 186.22.

C. *Analysis*

Although the gang expert testified about predicate offenses, the prosecution did not present evidence that those predicate offenses commonly benefited a criminal street gang and that the common benefit of the predicate crimes was more than reputational, as required under Assembly Bill No. 333. We agree with the People that "due to the significant and sweeping changes to section 186.22, on the current record it cannot be shown beyond a reasonable doubt that the jury would have reached the same conclusion under current law. As such, . . . the gang enhancement should be reversed, and the matter remanded to the trial court to provide the prosecution with the option of retrying [Prescott] on the gang enhancement."

Because there is no evidence the predicate offenses met the heightened requirements of Assembly Bill No. 333 and the jury was not asked to and did not make factual determinations now required under Assembly Bill No. 333, we will vacate the section 186.22, subdivision (b) enhancement findings and remand the matter so that the People may prove the applicability of the enhancement under the amended section 186.22. (*Tran, supra,* 13 Cal.5th at p. 1207; *People v. Montano* (2022) 80 Cal.App.5th 82, 104; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1128; *People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1032-1033; *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 823; *People v. Sek* (2022) 74 Cal.App.5th 657, 669.)

VI. *Section 667.5 Enhancement*

The People concede and we agree that under Senate Bill No. 136, which became effective during the pendency of this appeal, the trial court's imposition of sentencing enhancements under section 667.5, subdivision (b) should be stricken.

Prescott admitted allegations that he suffered three prior prison terms within the meaning of section 667.5, subdivision (b) based on prior convictions for violations of sections 459 and 460 (first prison prior); Vehicle Code section 10851, subdivision (a) (second prison prior); and Health and Safety Code section 11351 (third prison prior). The trial court at sentencing imposed one-year terms for each of two of the prior prison term enhancements. The court did not impose sentence on one of the prison priors because it arose from the same facts as a serious felony prior.

Effective January 1, 2020, Senate Bill No. 136 amended section 667.5, subdivision (b) regarding prior prison term enhancements. (See Stats. 2019, ch. 590.) Former section 667.5, subdivision (b) imposed an additional one-year term for each prior separate prison term or county jail felony term, except under specified circumstances. However, newly amended section 667.5, subdivision (b) imposes that additional one-year term only for prior separate prison terms served for convictions of sexually violent offenses. (§ 667.5, subd. (b); see *People v. Jennings* (2019) 42 Cal.App.5th 664, 682 [noting "[b]y eliminating section 667.5, subdivision (b) enhancements for all prior prison terms except those for sexually violent offenses, the Legislature clearly expressed its intent in Senate Bill No. 136 . . . to reduce or mitigate the punishment for prior prison terms for offenses other than sexually violent offenses"].)

Prescott's prison priors were for nonsexually violent offenses. (See Welf. & Inst. Code, § 6600, subd. (b).) Because his case is not yet final, we

agree with the parties that Senate Bill No. 136 applies retroactively to him (see *In re Estrada* (1965) 63 Cal.2d 740, 747-748); therefore, his two one-year prior prison enhancements must be stricken.  We need not remand for resentencing in this case since Prescott already received the maximum amount of time for which he was eligible.  (*People v. Gastelum* (2020) 45 Cal.App.5th 757, 772-773 ["where, as here, an enhancement is erroneously imposed and the trial court has already imposed the maximum possible sentence, a remand for resentencing is unnecessary"].)

## DISPOSITION

The gang enhancement allegation finding under section 186.22 is vacated and the matter is remanded to superior court to give the People an opportunity to retry the section 186.22 enhancement allegation under the law as amended by Assembly Bill No. 333, and for resentencing as appropriate. The superior court shall strike Prescott's two one-year enhancements imposed under former section 667.5, subdivision (b).  In all other respects, the judgment is affirmed.


O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


DATO, J.